[No. 9295.    Department Two.    February 1, 1911.]

J. L. KAHALEY, *Respondent*, v. FRYE & BRUHN,
INCORPORATED, *Appellant*.[1]

MUNICIPAL CORPORATIONS—STREETS—RUNAWAY TEAMS—INJURY TO PEDESTRIAN—SUFFICIENCY OF NEGATIVE EVIDENCE. There is sufficient evidence to support a finding of the violation of a city ordinance making it unlawful to leave any team standing unless it is securely fastened, where a delivery team equipped with a hitching weight ran away and eyewitnesses testified that they saw no weight dragging, although the driver testified on direct examination that he dropped the weight and set the brake; and the testimony in support of the verdict is not so purely negative as to preclude the jury from determining its weight, especially where the driver on cross-examination admitted that he sometimes did leave the team without hitching it.

SAME—INSTRUCTIONS. In an action for injuries through the running away of a team left unhitched, where proof of a custom of hitching teams by a weight was admitted to show the manner of hitching, upon an issue as to whether the driver dropped the weight, it is not error to instruct that the question was what the driver did and not what other teamsters were in the habit of doing.

Appeal from a judgment of the superior court for King county, Ronald, J., entered September 9, 1910, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a pedestrian, run down by a runaway team. Affirmed.

*Roberts, Battle, Hulbert & Tennant*, for appellant.

*Chas. F. Munday* and *Walter S. Fulton*, for respondent.

[1]Reported in 113 Pac. 247.

CHADWICK, J.—About six o'clock on the evening of the 16th day of January, 1909, plaintiff, a pedestrian, while crossing Columbia street at First avenue in the city of Seattle, was struck by a team of runaway horses, and hurled some distance onto a brick pile. He received injuries which the jury found to be permanent, and compensated in damages. Plaintiff had stepped off the sidewalk before he saw the team, which was then about fifteen feet away, and was caught before he could recover himself or retreat.

The team was hitched to a delivery wagon, and was owned and used by defendant to deliver meats from the Fulton market, then and, so far as the record shows, now operated by it. The market fronted on Second avenue, with a rear door on the alleyway between First and Second avenues. The driver, John Weston, had left the team at the rear door and gone into the shop to make up his load, which was arranged with reference to convenience and certainty of delivery and was a task which took some time. While he was thus engaged, the team ran away. Turning west on Columbia street, it went at great speed until brought to a standstill, a block or two beyond First avenue. A fact which will enter into the legal conclusions hereafter to be noticed, and proper to be stated here, is that it was provided by the ordinances of the city that it was unlawful for any person to leave any horse or other animal, attached to any vehicle or conveyance, in any public or uninclosed place without securely fastening or guarding it. Revised Ordinances, p. 192, § 30; p. 214, § 50. In compliance with these requirements, and following a general custom existing in Seattle, the rig was equipped with a forty-pound hitching weight. This was attached to a one-and-a-half-inch strap, leading along the wagon tongue, where it divided, and thence ran to the bits of each horse. A hole in the front of the wagon bed furnished a means of lowering the weight to the ground. The driver says that, when he left the team, the weight was down and the brake was set. There is no showing that the team was fractious or nervous. If

anything, the contrary is shown. There is no showing that there were any unusual noises, or anything to disturb the quiet of the team, or that the driver or defendant had any cause to anticipate any alarm whatever. Nor is it seriously contended that the ordinances of the city were not complied with, so far as the manner provided for hitching the team is concerned. Whether it was employed on this occasion is the question that vexes us. The case was tried before a jury, and from a judgment entered upon a verdict awarding damages in the sum of $2,000, this appeal is prosecuted.

It is the theory of the appellant, that no presumption of negligence arises from the mere fact that the team ran away; that it was necessary for respondent to go further and prove affirmatively some positive act of negligence or some omission of duty, before he can recover. On the other hand, it is the theory of the respondent that, if one is injured by a team running wild on the highway, unattended by a driver, a presumption of negligence follows, and in the absence of exonerating facts, the owner is liable; it being asserted that there is a well-settled distinction in the authorities between those cases where the team is running wild, and those where the team is running away in spite of the efforts of the driver. The lower court adopted the theory of respondent. For this, and a refusal to sustain the usual motions attending a jury trial, and a refusal to give requested instructions, a reversal of the case is insisted upon. It is further insisted that, although the lower court was right in its ruling on the motion for nonsuit, and a *prima facie* case was made out, appellant has met the burden by showing a compliance with the ordinances and customs hereinbefore alluded to, and its motions for judgment at the close of the case and for a new trial should be granted.

Carefully prepared briefs have been filed by counsel, but we feel that it is unnecessary to review the authorities. Without committing the court to the doctrine contended for by appellant, we may, so far as this case is concerned, accept it.

as the law, and still we think an affirmance of the judgment must follow. For, admitting that no presumption of negligence follows from the mere running away of a team, we are nevertheless controlled by the rule that legal conclusions as well as presumptions flow from a known or admitted state of facts, or where upon the whole record the minds of reasonable men would not differ as to the facts.

Now, to reverse and remand this case, we must hold, as a matter of law, that appellant's driver did, in fact, drop his forty-pound weight; or, in other words, "securely fastened" his team within the meaning of that term as defined by the ordinance and the custom relied upon. While the circumstances tending to show a failure to do this are slight, in our judgment they are evidence, and their weight was for the jury. The eyewitnesses of the accident, who testified in support of plaintiff's case, say that they did not see any weight dragging under the wagon when the team passed. We think this was enough to carry the case to the jury upon the motion for nonsuit. Nor do we think this circumstance comes within the rule of negative testimony. If a person, seeing the accident and having an equal opportunity to observe, says that he did not see a certain thing or object, it is evidence, and the weight of it must be left to the jury, unless its character is so purely negative and the positive testimony is so plain that there can be but one conclusion drawn by the court or jury. The rule laid down in Jones on. Evidence (2d ed.), 898, is:

"But the rule that positive testimony is of greater weight than negative has some important exceptions, and it should never come in conflict with the general rule that the weight of the testimony should be left to the jury; such testimony is admissible, and, together with corroborating circumstances, may outweigh positive testimony. As will be seen from the cases already cited, this question of the weight to be given to negative testimony often arises in railroad and other accident cases where it is claimed that signals were not given. In such cases the question is purely for the jury, and it has often

been held that negative evidence was sufficient to sustain a verdict. It is familiar practice to allow a witness, after he has described the situation, to state that he would have heard a bell or whistle, if it had sounded. The courts have frequently recognized a qualification of the general rule under discussion in those cases where one witness testifies that a fact occurred and another, having the same or better means of knowledge, testifies positively that it did not occur, each having testified as to his memory of the matter in difference."

And in Wigmore on Evidence, vol. 1, § 664:

"In applying the foregoing principle requiring that the witness' inferences be based on adequate data, courts have often been asked to exclude testimony based on what may be called *negative knowledge*, i. e. testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred. But there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred."

This case is to be distinguished from the case of *Long v. McCabe & Hamilton*, 52 Wash. 422, 100 Pac. 1016, where the question was the competency of a winchman. The testimony offered to prove incompetency was wholly negative. It might have been all true, and the winchman still have been competent. We held that such showing as was made was overcome by a positive showing that the alleged incompetent servant had had years of experience as a winchman and that the defendants could not on that account be held to a failure to use ordinary care in his employment.

The fact noted, when coupled with the evidence of the driver who said' on cross-examination:

"Q. Did you ever leave this team standing without putting the weight down? A. Very seldom. Q. Did you sometimes? A. Not down town, I did not. Q. I am not asking you that. A. I have done it sometimes; yes, sir. Q. Sometimes you get off the wagon and forget to drop the

weight? A. I do not know that I forget it, no, sir. Q. You sometimes do not do it, then? A. Yes, sir. Q. How often have you done that in the course of your teaming? A. Not very often. Q. You have done it? A. Yes, sir, I might make a short stop, but not long enough to load, and up on the hill;"

makes it probable that the driver may have been mistaken in this instance. The question is at least debatable, and its solution was for the jury.

There are a number of errors assigned going to the instructions of the court, but we think our conclusion covers all of them, unless it be an exception to an instruction wherein the court said:

"The question is not what other teamsters were in the habit of doing, but what did the teamster in this case do; and did that, if he did anything, constitute a secure fastening or guarding under all the facts and circumstances."

It is earnestly contended that this instruction took away from the jury all consideration of the question of custom. We believe the instruction was warranted. The custom was, if proven, a proper fact for the jury to consider; but proof of it would not exonerate the defendant so long as the question of compliance with it was a debatable question in the case then being tried. Proof of custom was received to show the manner of securing teams in the city of Seattle, and could not be accepted as proof of itself that the team was so secured on this occasion.

The judgment is affirmed.

DUNBAR, C. J., RUDKIN, CROW, and MORRIS, JJ., concur.